NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0202n.06

No. 20–3306

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 20, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE UNITED |
| Plaintiff – Appellee, | ) | STATES DISTRICT COURT FOR |
|  | ) | THE NORTHERN DISTRICT OF |
| v. | ) | OHIO |
|  | ) |  |
| JAMES D. THOMAS, | ) |  |
| Defendant – Appellant. | ) |  |
|  | ) |  |

BEFORE: GIBBONS, WHITE, and THAPAR, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Appellant James D. Thomas entered conditional pleas of guilty to multiple charges after his motions to suppress evidence seized from his home and the barber shop where he worked[1] were denied. He appeals, arguing that the affidavit submitted in support of the search warrant for his home contained false information, and that both affidavits failed to establish probable cause. We AFFIRM.

## I.

On July 26, 2018, the Summit County Court of Common Pleas signed a search warrant for Thomas's primary residence located at 509 Patterson Avenue in Akron, Ohio. The application for the warrant included an affidavit signed by Task Force Officer Jimmy Fields, of the Summit County Sheriff's Office. The affidavit contained substantial information establishing that Sondra McQuillen was a distributor of methamphetamine in Pennsylvania, as well as evidence linking her

---

[1] It is unclear from the record whether Thomas owned the barber shop or simply worked there. The distinction is unimportant to our analysis.

with Thomas. The affidavit explained that pen registers placed on McQuillen's phone revealed that she took trips from Clearfield County, Pennsylvania, to Akron, Ohio, (approximately six hours roundtrip by car) on a weekly or bi-weekly basis, and that she had done so at least twenty-two times. On July 1-2, 2018, McQuillen was in contact with an individual named Ronnie Sue Hummel, and their intercepted communications suggested that McQuillen was collecting money from Hummel before making a "trip." On July 3, 2018, McQuillen texted a cell phone used by Thomas, stating "be there in 10 [minutes]" to which Thomas replied "cool." GPS data from McQuillen's phone showed that in this same time frame McQuillen was in the Akron area for a short amount of time before returning to Pennsylvania.

On July 9, 2018, Hummel was once again in communication with McQuillen and said that she was going to bring McQuillen money because she needed "stuff." On July 11, 2018, McQuillen exchanged cars with Hummel because hers was having problems. Later that day, law enforcement followed McQuillen, who was a passenger in the Mazda borrowed from Hummel, from Clearfield County to Akron. During the drive, McQuillen called Thomas's number and advised that she was about an hour away, and subsequently texted that she would arrive in fifteen minutes or less. Investigators observed McQuillen in the area of the Top Notch Barber Shop at 1495 Aster Avenue, Akron, Ohio. Another officer observed the Mazda park in front of the entrance to the Top Notch Barber Shop at 9:24 p.m. A few minutes later the same officer "observed a male walk into the Top Notch Barber Shop." He subsequently "observed a female inside Top Notch Barber Shop while a male remained inside" the Mazda. Approximately twenty minutes later the female and a Black male exited the barber shop. The Mazda departed and drove back in the direction of Clearfield County. Police observed the male, who matched the description of Thomas, enter a vehicle registered to Thomas, and return to 509 Patterson Avenue, Akron, Ohio,

after making a single stop at a gambling store. On July 12, Hummel called McQuillen to complain about methamphetamine she received and McQuillen responded that it was from the "same person."

On the night of July 25, 2018, McQuillen placed a call to Thomas's phone number and told him she would be leaving at 4:00 am and arriving around 7:00 or 8:00 am. The next morning agents observed McQuillen traveling with an unknown male to Akron. At 7:43 am, agents observed McQuillen drop her unknown passenger off at a gas station, and shortly thereafter, park in the driveway of and enter the residence at 509 Patterson Avenue. Approximately thirty minutes later, McQuillen was seen departing 509 Patterson Avenue. She then picked up her passenger at the gas station and traveled back to Pennsylvania. Early that afternoon, Pennsylvania police conducted a traffic stop of McQuillen's vehicle, and executed a search warrant for the vehicle, during which they found six ounces of methamphetamine, one-eighth-ounce of cocaine, and one ounce of marijuana in McQuillen's purse.

In addition to detailing the surveillance of McQuillen, the affidavit stated that police had done a trash-pull at Thomas's home, on July 16, 2018, and discovered three rubber gloves and two pieces of foodsaver vacuum seal plastic. The police checked the mailbox at the address and found mail addressed to James D. Thomas at 509 Patterson Avenue. The affidavit also asserted that Thomas had the following criminal history: A 1998 arrest for felonious assault, misrepresenting identity, drug abuse (marijuana), probation violation, and having weapons under disability, which resulted in a conviction for aggravated assault; a 2003 arrest for failure to comply with the order of a police officer, obstructing official business, and possession of cocaine, which resulted in a conviction for failure to comply with the orders of a police officer; a 2004 conviction for illegal

manufacture of drugs; and a 2014 conviction for violating a prohibition on conveyance of weapons, drugs of abuse, or intoxicating liquor onto the grounds of a specified government facility.

Agents executed the search warrant for the Patterson Avenue home the same day it was issued. They recovered 28 grams of crystal methamphetamine, 32 grams of cocaine, a large amount of U.S. currency, and firearms.

Later that day, the agents obtained a second search warrant, this time for the Top Notch Barber Shop, located at 1495 Aster Avenue in Akron, Ohio. The affidavit in support of the second search warrant was much less detailed than the first affidavit, and contained the following relevant assertions:

> On July 26, 2018 Affiant is aware that the Summit County Drug Unit and the Drug Enforcement Administration executed a search warrant at 509 Patterson Avenue. Affiant is aware that 509 Patterson Avenue is the residence of James Deshaun Thomas SSN: 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 DOB: 12/23/1969. Affiant is aware that during the search of the residence, detectives recovered 28 grams of crystal methamphetamine, 32 grams of cocaine, a large amount of US currency and numerous firearms.
>
> Affiant is aware that detectives from the Summit County Drug Unit and agents from the Drug Enforcement Administration were actively watching Thomas at his barber shop located at 1495 Aster Avenue, during the search of his residence. Affiant is aware that at approximately 7:30 P.M. on July 26, 2018, Sergeant Nicholas Goodnite observed Thomas exit "Top Notch Barber Shop" and appear to lock the door from the outside utilizing a key. Affiant is aware that Thomas was taken into custody and transported to the Summit County Jail. Affiant is aware that SA Paul Straney used the key that was recovered from Thomas's person and actuated the door lock at 1495 Aster.
>
> Affiant is aware that on the 6th of February 2018 Affiant and Detective Ryan Knight interviewed an inmate at the Summit County Jail. Affiant is aware that this inmate gave information regarding James Thomas selling crystal methamphetamine and cocaine out of the Top Notch Barber Shop at 1495 Aster Avenue.

Agents executed the search warrant immediately and recovered a handgun and ammunition, a bag with 456 grams of methamphetamine, a separate bag with 286 grams of methamphetamine, a bag with 82 grams of cocaine, another bag with 60 grams of cocaine, 2 digital scales, 120 grams of marijuana, and an additional 1,330 grams of marijuana.

On August 15, 2018, Thomas was charged in a five-count indictment with possession with the intent to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), (Count 1); possession with the intent to distribute approximately 122 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), (Count 2); possession with the intent to distribute cocaine, in violation of §§ 841(a)(1) and (b)(1)(C), (Count 3); being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2 (Count 4); and possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A), (Count 5).

Thomas filed several motions to suppress the evidence seized from the Patterson Avenue home and the Top Notch Barber Shop. Thomas argued that both affidavits failed to establish probable cause to support the searches. Thomas also requested a *Franks* hearing, asserting that the criminal-history section of the first affidavit falsely asserted that Thomas had a 2003 arrest for possession of cocaine and a 2004 conviction for Illegal Manufacture of Drugs.

The district court conducted a hearing on Thomas's suppression motions, focused primarily on the need for a *Franks* hearing. The government conceded that the 2004 conviction for Illegal Manufacture of Drugs was erroneously included as part of Thomas's criminal history in the first affidavit. The affiant for the first warrant, Task Force Officer Jimmy Fields, testified that when preparing an affidavit to support a search warrant, he uses the Law Enforcement Automated Data System (LEADS) to determine a suspect's criminal history, and that he is certified to use LEADS,

has been using it regularly for several years, and believes it to be generally reliable. Fields testified that the conviction for illegal manufacturing of drugs included as part of Thomas's criminal history was pulled directly from the LEADS report for Thomas. After the error in the affidavit was raised by defense counsel, Fields investigated the issue and found that the local jail had intermingled the FBI number for Thomas with that of another James Thomas from Akron, and the other man's criminal history had erroneously been incorporated into Thomas's record. Fields testified that there were no obvious discrepancies in the LEADS printout, so he did not have reason to cross-check other sources to confirm the accuracy of the LEADS report.

Fields also admitted that his affidavit incorrectly stated that Thomas was arrested on November 24, 2003 for possession of cocaine (among other non-drug-related offenses), despite the LEADS report correctly stating that the arrest was for possession of marijuana. Fields testified that the inclusion of possession of cocaine rather than possession of marijuana was a "typographical error," and was not intentional.

The district court denied Thomas's motions to suppress. The court acknowledged that there were erroneous entries in the criminal-history section of the affidavit supporting the search warrant for Thomas's home, but found that Officer Fields had "every right" to rely on the LEADS report to determine Thomas's criminal history and that the errors in the affidavit were not intentional. The court further found that even if the two erroneous criminal-history entries were excluded from the affidavit, the affidavit nonetheless contained "overwhelming evidence of probable cause." The district court also found that the affidavit supporting the search of the Barber Shop contained "overwhelming probable cause."

On November 20, 2019, Thomas pleaded guilty to Counts 1–9 of the Superseding Indictment, preserving the right to appeal the denial of his motions to suppress, and was sentenced to 180-months' imprisonment. [2]

## II.

A basic principle of the Fourth Amendment is that there must be probable cause for a search warrant to issue. *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003); *see also* U.S. CONST. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). "Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). In determining whether a warrant passes muster under the Fourth Amendment, the key inquiry is whether "there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

"[W]here an affidavit is the basis for a probable cause determination, that affidavit 'must provide the magistrate with a substantial basis for determining the existence

---

[2] On October 8, 2019, the government filed a Superseding Indictment containing nine counts. The government represented that the Superseding Indictment merely separated the contraband found at the two locations into different counts, for the sake of clarity, but did not change the potential penalties. This was apparently an unintentional misrepresentation. Although splitting the drug charges to account for the different locations did not change the applicable mandatory minimum sentences, the superseding indictment split what was originally one firearm-possession charge into two, each carrying a five-year mandatory minimum sentence, to be served consecutively to any other sentence. Thomas was originally sentenced to a total of 240-months' imprisonment based on these mandatory minimums. He challenged the application of consecutive mandatory minimum sentences on Counts 8 and 9, arguing that the original indictment had included only one firearm-possession count and the government had represented that the superseding indictment would not impact any potential punishment. The parties reconvened and the government agreed to dismiss Count 9, which decreased Thomas's sentence to 180 months' imprisonment.

of probable cause.'" *Helton*, 314 F.3d at 819 (quoting *Illinois v. Gates,* 462 U.S. 213, 239 (1983).

Where police are seeking a warrant to search for illegal drugs, the affidavit must establish "'a fair

probability' that the drugs 'will be found in a particular place.'" *United States v. Church*, 823 F.3d

351, 355 (6th Cir. 2016) (quoting *Gates*, 462 U.S. at 238).

We review a district court's determination of probable cause "under two 'complementary'

standards." *Helton*, 314 F.3d at 820. (quoting *United States v. Leake,* 998 F.2d 1359, 1362 (6th

Cir. 1993). Factual findings are upheld unless they are clearly erroneous while legal conclusions

are reviewed *de novo. Id.* "When determining whether an affidavit establishes probable cause,

we look only to the four corners of the affidavit; information known to the officer but not conveyed

to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016)

(quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). Importantly, we afford "great

deference to the issuing judge's findings in support of a search warrant and will not set them aside

unless they were arbitrary." *Helton*, 314 F.3d at 820 (internal quotations omitted).

**A.**

Thomas asserts that the affidavit supporting the search warrant for his house contained

incorrect information regarding his criminal history. The government concedes that the affidavit

misrepresented an arrest for possession of marijuana as possession of cocaine, and that it

erroneously included a conviction for illegal manufacture of drugs. Under established Supreme

Court precedent,

> [W]here the defendant makes a substantial preliminary showing that a false
> statement knowingly and intentionally, or with reckless disregard for the truth,
> was included by the affiant in the warrant affidavit, and if the allegedly false
> statement is necessary to the finding of probable cause, the Fourth Amendment
> requires that a hearing be held at the defendant's request. In the event that at that
> hearing the allegation of perjury or reckless disregard is established by the
> defendant by a preponderance of the evidence, and, with the affidavit's false

> material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "Allegations of negligence or innocent mistake are insufficient," and "allegations of deliberate falsehood or of reckless disregard for the truth . . . must be accompanied by an offer of proof." *Id.* at 171.

Thomas presented no evidence that the misrepresentations in the affidavit were knowing, intentional, or made with reckless disregard for the truth. There is no evidence in the record to suggest that the inclusion of an arrest for possession of cocaine rather than marijuana was anything other than a negligent error. And there was clear evidence that the erroneous inclusion of a conviction for illegal manufacture of drugs was the result of an error in the LEADS system, a system which law enforcement officers regularly utilize to determine suspects' criminal histories. Thomas argues that Fields showed reckless disregard for the truth by failing to cross-check the LEADS criminal history with easily accessible Summit County criminal records, and in general by failing to provide correct information in the affidavit. But Fields testified that there was no indication that the LEADS criminal history was incorrect, and that it was generally a reliable source for criminal histories. Fields's failure to cross-check the LEADS record was not indicative of recklessness, and thus, the district court correctly concluded that Thomas failed to make a showing that false information was included in the affidavit intentionally or with a reckless disregard for the truth.

In any event, we agree with the district court that even with the erroneous criminal-history assertions excluded, the affidavit for the search of the Patterson Avenue home contained overwhelming evidence of probable cause.

Thomas argues that the evidence suggesting he was involved in drug dealing was too circumstantial to provide probable cause and that there was not a sufficient nexus between the alleged illegal activity and his home. Thomas asserts that Fields's conclusion that Thomas was dealing drugs to McQuillen, based on the context of McQuillen's contact and communications with Thomas, was too speculative to support probable cause. Thomas is correct that none of the individual facts or assertions in the affidavit directly establish that Thomas was dealing drugs. The phone conversations and text messages involving Thomas detailed in the affidavit include no mention or reference to drugs, drug transactions, or drug-related jargon, and although the police saw McQuillen and Thomas exit the Top Notch Barber Shop together during one of McQuillen's trips, they did not observe what occurred during the thirty-minutes the two were inside. However, considering the assertions in the affidavit as a whole, it is clear that probable cause was established. *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (courts are required to "look holistically at what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit."). McQuillen's status as a known drug dealer, the context of McQuillen's visits to Thomas shortly after conversations with her customer, and the fact that she was found with large quantities of drugs after meeting Thomas at his home, all raise the strong suspicion that Thomas was involved in drug dealing, and that he was utilizing his home to sell drugs.

It is correct that "if the affidavit fails to include facts that directly connect the residence with the suspected drug-dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Brown*, 828 F.3d 375, 384 (6th Cir. 2016). But the context of McQuillen's trips to Akron, and the fact that she was found with drugs after meeting with Thomas *at his home* clearly

establish a nexus between the suspected drug dealing and Thomas's home. This is not a case where the nexus between the suspected criminal activity and the place to be searched was "too vague or generalized to support a search warrant." *Id.* at 382; *see also United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (evidence that marijuana plants were growing near the residence and that a road connected the residence to the plants was "too vague, generalized, and insubstantial to establish probable cause").

Thus, notwithstanding the incorrect criminal-history information, the district court properly denied Thomas's motion to suppress the evidence seized from his home.

**B.**

Thomas next argues that the search warrant for the Top Notch Barber Shop lacked probable cause because the affidavit relied on a stale statement from an unverified informant, was boilerplate, established no nexus to any illegal activity, and was the fruit of the illegal search of his home. Given our determination that the search of Thomas's home was supported by probable cause, we reject Thomas's fruit-of-the-poisonous tree argument without further analysis.

Although the district court found that the search of the barber shop was supported by "overwhelming probable cause," the factual allegations in the affidavit in support of the warrant were undeniably sparse: The affidavit included three factual assertions in support of probable cause: (1) the search warrant executed on Thomas's home resulted in the recovery of substantial amounts of crystal methamphetamine, cocaine, a large amount of U.S. Currency, and numerous firearms, (2) detectives were actively watching Thomas during the search of his residence, and observed him exit the Top Notch Barber Shop and lock the door utilizing a key; and (3) on February 6, 2018, affiant and another officer interviewed an inmate at the Summit County Jail who

gave information regarding Thomas selling crystal methamphetamine and cocaine out of the Top Notch Barber Shop.

Although the discovery of drugs at Thomas's home supports the conclusion that Thomas himself was involved in illegal drug activity, that alone is not enough to support the inference that drugs would likely be found at Thomas's place of work. Nor does the fact that Thomas exercised some level of control over the Barber Shop, as demonstrated by his locking the shop, sufficient to support such a conclusion. The tip from the confidential informant is the only information contained in the affidavit that arguably ties any criminal activity to the location to be searched. The problem, though, as Thomas points out, is that the affidavit provides no indication of the informant's basis of knowledge, nor any indication of why the statement is reliable.

We need not reach a firm conclusion as to probable cause because, regardless, the evidence was admissible under the good-faith exception. Under *Leon*, the fruits of a search performed subject to an otherwise validly issued warrant are not automatically excluded if a court later finds that the warrant was not supported by probable cause. *United States v. Leon*, 468 U.S. 897, 906 ("Whether the exclusionary rule is appropriately imposed in a particular case, our decisions make clear, is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'") (quoting *Gates*, 462 U.S. at 223). The exclusionary rule does not bar the admission of evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905. This is commonly referred to as the "good-faith exception." *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007). The good-faith exception is inapplicable, and suppression of evidence is appropriate, in four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless

disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006).

Given that there was no false information included in the affidavit for the Top Notch Barber Shop, nor any reason to believe that the issuing magistrate wholly abandoned her judicial role, situations one and two are inapplicable. And although the affidavit in this case was sparse, it was not so lacking in factual allegations that it could be considered "bare bones." *See Christian*, 925 F.3d at 312 (explaining that the "bare bones" label is reserved "for an affidavit that merely 'states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge'" (quoting *United States v. Washington*, 380 F.3d 236, 241 n.4 (6th Cir. 2004))). Thus, the question is whether the affidavit's lack of reliable evidence supporting a nexus between the alleged illegal activity and the place to be searched made the officer's reliance on the warrant objectively unreasonable.

This Court has had numerous occasions to explore the parameters of "objective reasonableness" in the context of affidavits that failed to establish a sufficient nexus between illegal activity and the place to be searched, and has arrived at different conclusions based on the specific facts alleged in the affidavits. *See Carpenter*, 360 F.3d at 596 (finding that an affidavit describing a marijuana field near a residence, with a road between the field and the residence, was not sufficient to establish probable cause, but that officers reliance on the warrant was not objectively unreasonable); *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005) (holding

that where an affidavit merely indicated that a confidential informant had observed controlled substances at or in the residence or located on the person of a suspect, without any description of the timing of these observations, or where the residence was, there was no connection between the criminal activity at issue and the place to be searched, and therefore no reasonable officer would have believed the warrant to be reliable); *Helton*, 314 F.3d at 824–25 (holding that where the only nexus between the criminal activity and the place to be searched came from an anonymous tipster, with little corroboration, no reasonable officer would believe that the affidavit established probable cause); *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (holding that the police reasonably relied on warrant that failed to provide a sufficient nexus for probable cause because the affidavit contained extensive detail describing the place to be searched, the nature of the criminal enterprise in which the defendant was involved, the instrumentalities of that enterprise, and the status of the police investigation, in combination with the statement that the rooms in the residence "were available to" the defendant). Because of the fact-intensive nature of the good-faith/objectively reasonable inquiry, there is no bright-line rule establishing when an officer's reliance on a warrant subsequently determined to lack probable cause is reasonable.

An obvious wrinkle in the good-faith analysis here is the fact that evidence included in the affidavit for the search of Thomas's home, but inexplicably omitted from the Top Notch Barber Shop affidavit, would have undoubtedly supported a finding of probable cause to search the barber shop. We know from the first affidavit that police had observed McQuillen, a known drug dealer, travel long distances from out of state to stop for a short period at the Top Notch Barber Shop; that she had been in contact with Thomas regarding the visits; and that there was evidence that she went on these trips when her supply of drugs was low, and sold drugs to regular customers immediately following her return. When paired with the discovery of drugs and weapons at

Thomas's home, where McQuillen had also been observed meeting with Thomas, these facts would undoubtedly have supported probable cause to search the barber shop. But none of this highly probative information was included in the Top Notch Barber Shop affidavit.

In the Sixth Circuit, district courts are generally required to restrict their good-faith analysis to information within the four corners of the affidavit. In *Laughton*, this court explicitly held that,

> a determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit. Whether an objectively reasonable officer would have recognized that an affidavit was so lacking in indicia of probable cause as to preclude good faith reliance on the warrant's issuance can be measured only by what is in that affidavit.

*Laughton*, 409 F.3d at 751–52. But the court carved out a narrow exception to this rule in *Frazier*, explaining "[b]ecause the Supreme Court has, in the past, looked beyond the four corners of the warrant affidavit in assessing an officer's good faith, we do not read *Laughton* as prohibiting a court in *all* circumstances from considering evidence not included in the affidavit." *United States v. Frazier*, 423 F.3d 526, 534 (6th Cir. 2005). The court in *Frazier* read *Laughton* as limited to whether a search could be "saved under the 'good faith exception' on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause." *Id.* at 535 (internal quotations omitted). This Court in *Frazier* found that the good-faith exception could apply where information clearly known and considered by the magistrate, but inadvertently excluded from an affidavit, supported a finding of probable cause. *Id.* at 534–35. The court explained that the rationale underpinning *Leon* could not support a rule excluding information "known to the officer and revealed to the magistrate." *Id.* at 535.

Here, the same magistrate considered and issued both warrants—for the house and the barber shop—and did so on the same day. Thus, it is difficult to imagine that the magistrate did not recall and consider the highly relevant facts put forth in the first affidavit when evaluating whether there was probable cause to search the Top Notch Barber Shop. This does not end the

inquiry, though, because good-faith is ultimately a question of officer reasonableness in executing the warrant, not the reasonableness of the issuing magistrate.

In *Frazier*, the court found that the good-faith exception applied where a magistrate requested that a set of affidavits be amended to include information corroborating the veracity of information provided by a confidential informant, and the magistrate issued six search warrants although the additional information was inadvertently added to only five of the affidavits. *Id.* at 532–33. In *Frazier*, it could be reasonably assumed that both the magistrate's assessment of probable cause, as well as the officer's reliance on the warrant, were based on the assumption that the sixth affidavit also included the requested revisions that were made to the first five affidavits, and which supported probable cause. Here, the analysis is not quite as simple. Different officers prepared and signed the affidavits for the Patterson Avenue home and the Top Notch Barber Shop, so it is not as clear that the officer's reliance on the warrant for the Top Notch Barber Shop was informed by the facts included in the first affidavit; nor is it obvious that the officer knew that the magistrate had previously been informed of additional relevant facts. Nonetheless, Fields, the affiant for the first warrant, testified that he was involved in the execution of the Top Notch Barber Shop warrant and that the two searches involved the same team of officers. The focus of the good-faith inquiry is whether the officers who executed the search reasonably relied on the relevant warrant, not whether the affiant was reasonable in requesting the warrant in the first place. And although in most cases there would be no need to parse these details, here the distinction is crucial. Although it may have been unreasonable for the officer who prepared the affidavit and requested the warrant to assume that the sparse details provided in the affidavit were sufficient to support probable cause, the team of officers executing the warrant[3] were generally aware of both the

---

[3] It is unlikely this officer was involved in the search itself, as it appears that the search was initiated nearly simultaneously with the magistrate's issuance of the warrant.

evidence supporting probable cause to search Thomas's home and that those facts had been presented to the magistrate. *See* Hearing Transcript, R. 86, PID 454–55 (the affiant for the search warrant of Thomas's home also participated in the search of the Top Notch Barber Shop). Thus, the officers executing the warrant likely had little reason to question whether probable cause supported the warrant to search the Top Notch Barber Shop. For that reason, the narrow exception to the rule limiting the good-faith analysis to the four corners of the affidavit is applicable here. Considering the information included in the affidavit, as well as information known both to the team of officers executing the warrant and the issuing magistrate, we conclude that the search of the Top Notch Barber Shop was executed in good faith reliance on the warrant. Thus, we affirm the district court's denial of Thomas's motion to suppress the evidence seized from the barber shop.

**III.**

For the foregoing reasons, we AFFIRM.